[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1103 
The appellant, Donald Dallas, was indicted for two counts of capital murder relating to the death of Hazel Liveoak: murder during a robbery in the first degree and murder during a kidnapping in the first degree. The appellant was also indicted for 3 counts of fraudulent use of a credit card, 1 count of theft of property in the second degree, and 10 counts of violations of the Computer Crime Act, § 13A-8-100, et seq. The jury found the appellant guilty on all counts. The jury, by a vote of 11-1 recommended that the appellant be sentenced to death by electrocution. Subsequently, a sentencing hearing was held before the trial court, and the trial court sentenced the appellant to death by electrocution.
The record indicates that on July 12, 1994, Mrs. Hazel Liveoak left her home in Millbrook to go grocery shopping in Prattville. As she was placing her groceries into her car, the appellant and co-defendant, Carolyn Yaw, pushed Mrs. Liveoak into the car and forced her to lie face down on the floorboard. He and Yaw got into the car. The appellant told Mrs. Liveoak that he wanted her money. When she informed him that she only had $10.00 with her, he replied that that was not enough and began to drive toward Greenville. Mrs. Liveoak told the appellant that she had a credit card that could be used at an automatic teller machine. In Greenville, the appellant drove to the end of a dirt road, opened the trunk and forced Mrs. Liveoak into it. With Mrs. Liveoak in the trunk, the appellant and Yaw travelled to Montgomery. The appellant drove the car to the bank and parked in an area of the parking lot far removed from the bank building. Yaw was successful in using Mrs. Liveoak's credit card in 3 of 11 transactions to obtain $300.00. The appellant remained at the car, talking to Mrs. Liveoak while Yaw withdrew the money. Mrs. Liveoak prayed for the appellant and his family while she was in the trunk. The appellant told Mrs. Liveoak that he and Yaw would abandon the car and telephone for help to ensure that she was released from the trunk. Mrs. Liveoak told the appellant that she had a heart condition. Mrs. Liveoak was never released from the trunk and she suffered a heart attack and died.
Evidence was presented tending to prove that Mrs. Liveoak did not die immediately *Page 1104 
but rather lived for a number of hours. Evidence was also presented that Mrs. Liveoak had a number of bruises and cuts on her hands consistent with trying to free herself or calling for help. The State presented evidence that the appellant and Yaw, after leaving Mrs. Liveoak, went to a "crack house" to purchase cocaine with the stolen money. They then went to a motel and spent the night smoking crack cocaine. The testimony of Dennis Bowen, an acquaintance of the appellant, indicated that the appellant and Yaw were bragging at the crack house that they had placed an elderly lady in the trunk of a car and had left her there. When Bowen questioned the appellant about his statement, he responded that he "hoped the old lady would die." Evidence was also presented showing that, three days before this offense, the appellant had abducted and robbed Wesley Portwood, an 80-year-old man, in the parking lot of a Kmart in Prattville. As with Mrs. Liveoak, the appellant made Portwood lie face down on the floorboard of his car, then drove to a remote area and ordered him out of the car. The appellant told Portwood to lie down in the weeds or he would place him in the trunk of the car. Portwood told the appellant that he did not want to get into the trunk because he would "smother inside." The appellant then robbed Portwood of $160. Portwood survived the abduction.
The appellant testified at trial. On cross-examination, when asked why he left Mrs. Liveoak in the trunk knowing of her condition, he replied that "[h]e didn't want to get caught."
 I.
The appellant argues that the prosecution struck black veniremembers in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), and Ex parte Branch, 526 So.2d 609
(Ala. 1987), by using 12 of his 16 strikes to remove 12 of the 15 black venire-members.
Although the trial court acknowledged that the appellant had failed to prove a prima facie case of racial discrimination based solely on these numbers, it nevertheless required the prosecutor to explain his reasons for his strikes. Therefore, we must examine the stated reasons. "[O]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez v. New York,500 U.S. 352, 358-60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). Where the challenged party's explanations for its strikes are a part of the record, the appellate court will review those explanations regardless of the manner in which they came into the record. See, e.g., Huntley v. State, 627 So.2d 1013, 1016
(Ala. 1992); Jackson v. State, 594 So.2d 1289, 1293
(Ala.Cr.App. 1991); Williams v. State, 548 So.2d 501, 504
(Ala.Cr.App. 1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159,103 L.Ed.2d 218 (1989). Additionally, "[a] circuit court's ruling in a Batson objection is entitled to great deference and we will reverse a circuit court's Batson findings only if they are 'clearly erroneous.' " Branch, 526 So.2d at 625-26.
The prosecutor stated that 5 of the 12 veniremembers were struck because they indicated that they were opposed to the death penalty. "Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike." Johnson v. State,620 So.2d 679, 696 (Ala.Cr.App. 1992), reversed on other grounds,620 So.2d 709 (Ala. 1993), on remand, 620 So.2d 714
(Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285,126 L.Ed.2d 235 (1993). Two of the 12 veniremembers were struck because the prosecutor thought they were inattentive during voir dire. The fact that a veniremember "appear[ed] to be asleep or inattentive" during voir dire has been held to be an acceptable reason for a strike. Kelley v. State, 602 So.2d 473,476 (Ala.Cr.App. 1992). Four of the 12 veniremembers were struck because they had family members who had been convicted of a crime, which has also been held to constitute a race-neutral reason for striking a potential juror. See Gorum v. *Page 1105 State, 671 So.2d 764 (Ala.Cr.App. 1995); Fort v. State,668 So.2d 888 (Ala.Cr.App. 1995).
The last veniremember to be struck by the prosecutor was struck because he could not complete his jury questionnaire. He did, in fact, serve as an alternate juror. The prosecutor stated that "although [he] liked him in all other respects, with the bank record and the Computer Crime Act allegations, [he] felt it would not be the best for him to sit as a juror in this case." Cf. Vanderslice v. State, 671 So.2d 769, 770
(Ala.Cr.App. 1995) (a veniremember's apparent inability to understand what was being said to him was a sufficient race-neutral reason to justify a peremptory strike). "As long as there is a legitimate nonracial reason for the challenged strike, the Batson principles are not violated. Zanders v. AlfaMutual Insurance Co., 628 So.2d 360, 361 (Ala. 1993).
In the present case, the trial court's denial of the appellant's Batson motion was not "clearly erroneous." Ex parteBranch, 526 So.2d at 625-26.
 II.
The appellant argues that the trial court erred in not granting his challenge for cause as to a veniremember. Additionally, he asserts that the trial court erred in not granting his challenge for cause as to another veniremember based on that veniremember's alleged predisposition to impose the death penalty.
During the voir dire examination of a potential juror, the following occurred:
 "THE COURT: This is a capital murder case, meaning you may or may not be called upon to make a decision about capital punishment. Do you understand that?
"JUROR # 129: Yes, sir.
 "THE COURT: You may not be called upon because there are other lesser included offenses for you to consider. However, if you are called upon to make that decision, I need to ask you these questions, because it would be too late at the end of the case to ask you these questions. Capital punishment means life without parole or the death penalty. Do you have an opinion one way or the other about capital punishment?
"JUROR # 129: Yes, sir.
"THE COURT: What is that, please, ma'am?
 "JUROR # 129: I don't believe in capital punishment.
 "THE COURT: When you say you don't believe in capital punishment, I am assuming you are talking about the death penalty; is that right?
JUROR # 129: Yes, sir.
 "THE COURT: You don't believe it serves an appropriate function in our society?
"JUROR # 129: No, sir.
 "THE COURT: Let me ask you this. Let me tell you this first. In Alabama, here, the State of Alabama recognizes certain criminal offenses whereby the punishment may be the death penalty. Now, I recognize that you may personally disagree with that. But let me ask you this. If you are selected as a juror in this case, and you are called upon to make that decision, do you think you could entertain the possibility of the death penalty as a sentence in this case?
"JUROR # 129: No, sir.
 "THE COURT: You don't think if I give you instructions that would tell you you need to consider and weigh these factors, that you could do that in deciding whether or not the death penalty could be imposed?
"JUROR # 129: No, sir.
 "THE COURT: What you are telling me then is your personal opinion is just so great and you just disagree with it so much you just couldn't rule and you wouldn't consider that at all?
"JUROR # 129: Yes, sir.
"THE COURT: State?
"(PROSECUTOR): No questions.
"THE COURT: Defense?
"EXAMINATION BY DEFENSE COUNSEL.
 "Q: [Juror # 129], do you understand that the Alabama Legislature passes the laws that we are governed by herein Alabama?
"A: Yes, sir. *Page 1106 
 "Q: And do you understand that the Alabama Legislature has passed a law that authorized the death penalty in some cases where the circumstances are so bad that a judgment has been made by the Legislature that the death penalty ought to be authorized in those cases? Do you understand that's the law?
"A: Yes, sir.
 "Q: Now, you have expressed, I think, a pretty clear personal belief against the death penalty.
"A: Yes, sir.
 "Q: Do you understand, [Juror # 129], when you enjoy the benefits of citizenship in this country and in this state, that it carried with it certain obligations?
"A: Yes, sir.
"Q: And one of those obligations is jury service.
"A: Yes, sir.
 "Q: Do you understand that when you are called to come an serve as a juror, that you must follow the law that's explained to you by the judge, even if you don't agree with that law?
"A: Yes, sir.
 "Q: Now, do you understand that in a civilized society we have to follow the law?
"A: Yes, sir.
 "Q: And that if we don't follow the law, all of us will be in serious danger of our life and limb?
"A: Yes, sir.
 "Q: [Juror # 129], what happens in cases like this is that the judge will explain to you what the law is. And as a juror, you will be required to take an oath. Do you understand that? "A: Yes, sir.
 "Q: And if you take that oath, you must abide by that oath to follow the law?
"A: Yes, sir.
 "Q: If the judge instructs you that if you make a finding as a juror that the defendant is guilty of capital murder, do you understand that you must follow his instructions and consider two punishments — one being life without parole, and one being the death penalty?
"A: Yes, sir.
 "Q: As a juror . . . do you understand it is your obligation to listen to the evidence that comes from the witness stand and from the Judge as he explains that to you and apply the law to the evidence?
"A: Yes, sir.
 "Q: Now, regardless of your personal feelings, can you follow the law?
"A: Yes, sir.
 "Q: Can you swear under oath that you will listen to the judge and apply the law to the facts and the evidence that comes in from the witness stand?
"A: Yes, sir.
 "Q: You are not saying here today, are you, that you would automatically vote against the death penalty if the facts are and if the jury finds that the facts satisfy the law about the death penalty? You wouldn't automatically dismiss the death penalty as an option, would you?
"A: No, sir.
 "Q: You would listen to the facts and listen to the testimony and listen to the judge, and you would consider death as a possible sentence and life without parole as a possible sentence if he is found guilty, wouldn't you?
"A: Yes, sir.
"[DEFENSE COUNSEL]: That's all.
"EXAMINATION BY [PROSECUTOR]:
 "Q: [Juror # 129], I am a little confused now. On the judge's questions you said that you would not consider the death penalty as a punishment, that you would not consider it?
"A: No.
 "Q: Let me ask you these questions, then. Maybe I misunderstood you. Are you against the death penalty?
"A: Yes, sir.
"Q: You said a strong belief?
"A: Yes, sir.
 "Q: Is that belief so strong that you feel like it would really get in the way with your ability to follow the judge's instructions? *Page 1107 
"A: Yes, sir.
 "Q: The judge is not going to tell you how to vote, [Juror # 129]. I want to make sure you understand that. When it comes to the death penalty, that's something you have got to do on your own. Do you ever foresee yourself being able to vote for the death penalty in any case?
"A: No, sir.
"[PROSECUTOR]: That's all."
In Taylor v. State, 666 So.2d 36, 47 (Ala.Cr.App. 1994), this Court outlined the guidelines for determining whether a potential juror should be excluded for cause based on his or her feelings concerning capital punishment:
 " 'The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism." Id.
 " 'A trial judge's finding on whether or not a particular juror is biased "is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province." Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. "A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to bean abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala. 1981).'
 "Martin v. State, 548 So.2d 488, 490-91
(Ala.Cr.App. 1988), affirmed, 548 So.2d 496
(Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). '[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judges to disqualify a juror.' Ex parte Whisenhant, 555 So.2d 235, 241 (Ala. 1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990)."
Based on the record before us, including the juror's unequivocal response that she would not be able to impose the death penalty in any case, we conclude that the trial court did not err in granting the State's challenge for cause.
As to the trial court's refusal to grant the appellant's challenge for cause on the other potential juror, which was based on her alleged reverse-Witherspoon responses, the record indicates that this veniremember stated that she would not automatically impose the death penalty in every capital case, but would follow the trial court's instructions and would base her decision regarding punishment upon the aggravating and mitigating circumstances that were presented. Taylor v. State, supra. For this reason, we find no error in the trial court's failure to grant the appellant's challenge for cause.
 III.
The appellant argues that the trial court erred in refusing his requested jury charges on reckless murder and criminally negligent homicide. The appellant argues that the reckless murder instruction was warranted because of his alleged voluntary intoxication at the time of the offense. Additionally, he argues that a criminally negligent homicide instruction was warranted because "he inadvertently created the risk of death by placing the victim in the trunk and he should have been aware of the risk but was not due to his intoxication." *Page 1108 
Although the trial court properly charged the jury on the lesser included offenses of felony murder and manslaughter, it correctly denied the charge on reckless murder and criminally negligent homicide because there was no rational basis for a verdict finding the appellant guilty of either offense. No evidence supported a basis for an instruction on reckless murder as defined by § 13A-6-2(a)(2), Code of Alabama
1975, because the appellant's actions were directed solely at the victim and therefore did not " 'manifest extreme indifference to human life.' " Parker v. State, 587 So.2d 1072,1084 (Ala.Cr.App. 1991), quoting Northington v. State,413 So.2d 1169 (Ala.Cr.App. 1981), cert. quashed, 413 So.2d 1172
(Ala. 1982). Additionally, there was no evidence presented at trial that the appellant was under the influence of cocaine at the time of the killing and thus voluntarily intoxicated at the time of the offense.
The evidence presented by the State indicated that the appellant acted with the specific intent to kill. He had been informed by the victim of her heart condition and did not want to "get caught." Because the evidence tended to show that the appellant acted with the specific intent to kill, the instruction on criminally negligent homicide was also correctly refused. Certainly, it cannot be said that the appellant failed to perceive that death might result if an elderly woman with a heart condition was locked in the trunk of a car and left in the middle of summer in Alabama. Therefore, the trial court was correct in refusing the appellant's charge.
 IV.
The appellant argues that the trial court erred in giving four charges that the State requested. The record indicates that, after some alteration, the trial court gave the following instructions, to which the appellant takes issue:
"Charge # 20:
 "In this case the defendant has testified, as he has a perfect right to do. He has a perfect right to have his testimony considered with the testimony of each and every other witness who has testified in this case. However, in passing upon his testimony, you ladies and gentlemen of the jury have a right to consider the fact that he is the defendant and as such has an interest in the outcome of this case.
"Charge # 21:
 "If you find from the evidence that any witness has been impeached by a prior inconsistent statement or by giving contradictory testimony in court, you may, in your discretion, consider that in evaluating and weighing that witness' testimony."
The trial court properly charged the jury that it had the exclusive prerogative to determine the weight or credibility to be afforded the evidence presented. The jury charges in their entirety, including the two charges quoted above, made clear to the jury that it could accept or reject any part of the testimony given by any witness and were correct statements of law. See Slaton v. State, 680 So.2d 879, 895
(Ala.Cr.App. 1995), affirmed, 680 So.2d 909 (Ala. 1996).
The appellant also argues that the trial court improperly charged the jury as follows:
"Charge # 6:
 "If you find from the evidence that the defendant fled from the scene of the killing, then you may consider that as evidence tending to show his consciousness of guilt."
This instruction does not improperly raise the evidence of flight to a presumption of guilt, Ex parte Weaver,678 So.2d 284 (Ala. 1996), and clearly informed the jury that the evidence was to be evaluated in determining whether there was flight.Id. See also Ex parte Musgrove, 638 So.2d 1360, 1367
(Ala. 1993).
However, the facts of the case provided sufficient evidence to place before the jury the question whether the appellant engaged in flight following the offense so as to imply a consciousness of guilt.
 "In Sartin v. State, 615 So.2d 135, 137
(Ala.Cr.App. 1992), this court stated: *Page 1109 
 " ' "In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution. This principle is based upon the theory that such is admissible as tending to show the accused's consciousness of guilt. The flight of the accused is admissible whether it occurred before or after his arrest.
 " ' "The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight. This is especially true of those acts of the accused which tend to show that the flight was impelled by his consciousness of guilt."
 " 'C. Gamble, McElroy's Alabama Evidence, § 190.01(1) (4th ed. 1991) (citations omitted). See also 2 Wigmore, Evidence § 276(4) (Chadbourn rev. 1979); Chandler v. State, 555 So.2d 1138
(Ala.Cr.App. 1989).' "
Long v. State, 668 So.2d 56, 60-61 (Ala.Cr.App. 1995).
The record reveals that the appellant immediately left the scene of the offense after he locked the victim in the trunk. He went to a "crack house" where he purchased crack cocaine and then checked into a motel in Chisolm rather than returning home. Although he stated that he indicated to the victim that he would return or send help, no evidence of his subsequent behavior supports this claim. The evidence concerning the appellant's actions immediately following the offense was sufficient to present a question of fact to the jury for their determination as to whether there was flight and, if so, how much weight it should be accorded. "The reason for the defendant's flight is a question properly reserved for the jury after a consideration of all the relevant circumstances." Ex parte Lowe, 514 So.2d 1049, 1050
(Ala. 1987). "Whether the evidence is sufficient to negate the inference that he fled because of a consciousness of guilt is a question for the jury, not the court." Harrison v. State,580 So.2d 73, 76 (Ala.Cr.App. 1991). Thus, the trial court did not err in instructing the jury on the evidence of flight, as its possible existence was a proper matter for their determination.
The appellant cites the following charge as improper as he alleges that it effectively shifted the burden of proof as to the element of intent to the appellant:
 "You may infer that a person intends the natural consequences of what he does if the act is done intentionally."
However, because the language of the trial court's instruction is permissive rather than mandatory, it is not an unconstitutional, burden-shifting instruction so as to violate Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450,61 L.Ed.2d 39 (1979). See Freeman v. State, 555 So.2d 196, 208-09
(Ala.Cr.App. 1988), affirmed, 555 So.2d 215 (Ala. 1989), cert. denied, 497 U.S. 1046, 111 S.Ct. 8, 111 L.Ed.2d 823 (1990).
A review of the entire jury charge given by the trial court in the guilt phase indicates that the jury was properly and thoroughly instructed as to its role as factfinder as well as to the law related to this case.
 V.
The appellant argues that the trial court erred in giving an instruction to the jury during the sentencing phase on the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses because, he says, the facts of the case did not support such an instruction.
The trial court made the following specific findings of fact with regard to that aggravating circumstance:
 "This Court finds that the State has proven beyond a reasonable doubt the aggravating circumstance that this offense was especially heinous, atrocious, or cruel compared to other capital offenses. The aggravating circumstance 'the capital offense was especially heinous, atrocious, or cruel compared to other capital offense' was intended to apply 'to only those consciousness or pitiless homicides which are unnecessarily tortuous to the victim.' Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981). The State must prove beyond a reasonable doubt, as the court finds in this case, that Mrs. Liveoak experienced pre-mortem suffering; however, the suffering may either *Page 1110 
be physical or psychological. 'Heinous' means extremely wicked or shockingly evil. 'Atrocious' means outrageously wicked and vile. 'Cruel' means designed to inflict a high degree of pain with utter indifference to or even the enjoyment of the sufferings of others. This Court cannot imagine a more depraved and cruel murder of a person than what Mrs. Liveoak suffered at the hands of Dallas. He left her in the trunk of her automobile on a summer afternoon so that she would die simply because he did not want to get caught. He literally entombed her in the trunk of her car. The suffering of Mrs. Liveoak is unimaginable. She lay helpless in the hot, stuffy trunk and fought to escape, until the conditions that she was left in caused her death. Yet, even as torturous as her death, the cruelest act committed by Dallas was that he gave Mrs. Liveoak false hope; he told her, as she was praying for him, and that he would send help. The help never arrived because the evidence clearly showed that he had no intention of sending her help. Mrs. Liveoak was tortured at the hands of Dallas, and this Court finds that this killing was especially heinous and atrocious or cruel as envisioned under Ala. Code, Section 13A-5-49(8) (1975)."
Because the evidence supported the finding that the aggravating circumstance that the killing was especially heinous, atrocious, or cruel, the jury's consideration of that circumstance during the sentencing phase was proper. The jury was instructed on the meaning of the words of the aggravating circumstance in the context of capital sentencing. Those instructions correctly followed the recognized construction of that aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer,399 So.2d 330, 334 (Ala. 1981), in which the court stated: "The aggravating circumstance listed in § 13-1-6(8) [now §13A-5-49(8)] was intended to apply to only those consciousness or pitiless homicides which are unnecessarily torturous to the victim." See also Ex parte Rieber, 663 So.2d 999 (Ala. 1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437
(1995).
Thus, the trial court's instruction was supported by the evidence and was sufficient to guide the jury in deciding whether to recommend the death penalty.
 VI.
The appellant argues that the trial court erred in allowing the State to introduce victim impact testimony into evidence during the sentencing phase because, he says, it violated his due process rights under the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, he argues that statements by the victim's son concerning how the death of his mother had affected him and his family, as well as a letter sent by the victim's daughter to the trial judge, rendered the trial fundamentally unfair.
An examination of the record indicates that the victim's son testified that his mother was a Christian and that her murder had a profound impact on her children and grandchildren. Mr. Liveoak did not express any opinion about the crime, the appellant, or the appropriateness of a death sentence. Mr. Liveoak's statements with respect to the impact of his mother's murder on him and on his family were relevant to the jury's decision as to whether to recommend that the death penalty be imposed. See Payne v. Tennessee, 501 U.S. 808,111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Additionally, there is no indication from the record that a victim impact statement was included in the presentence investigation report. Cf. Exparte Rieber, supra. ("[A] remand is not required in every death penalty case in which a victim impact statement appears in a presentence investigation report.")
Nor was there any indication that the trial court considered a letter written by the victim's daughter to the trial court addressing her thoughts on the appellant and the appropriate punishment. Because the letter was received by the trial court approximately two weeks after the court entered its sentencing order, the letter could not have been considered in determining the sentence; thus, the appellant's due process rights were not violated. *Page 1111 
 VII.
The appellant argues that he received ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, because of, he says, an actual conflict of interest on the part of his trial counsel.
A review of the record indicates that the appellants' argument is without merit. Before trial, one of the appellant's attorneys filed a motion to withdraw from representation of the appellant. The motion was based upon that attorney's having been previously appointed by the attorney general to represent the Alabama Department of Mental Health and Mental Retardation in an unrelated civil case. The attorney stated in his motion that he had conferred with the Disciplinary Commission of the Alabama State Bar Association, which issued an advisory opinion stating that a conflict did not exist. The trial court denied the motion without a hearing.
"In order to demonstrate a violation of his Sixth Amendment rights, a defendant must show that an actual conflict of interest adversely affected his lawyer's performance."Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719,64 L.Ed.2d 333 (1980). "An actual conflict of interest exists when an attorney owes loyalty to a client whose interests are adverse to another client." Self v. State, 564 So.2d 1023, 1033
(Ala.Crim.App. 1989), cert. quashed, 564 So.2d 1035
(Ala. 1990).
While it is true that the attorney general had appointed the appellant's trial counsel as a deputy attorney general in an unrelated civil matter, an actual conflict of interest did not exist in this case because the appellant's interests were not adverse to that of the Alabama Department of Mental Health and Mental Retardation. The appellant argues that we must presume prejudice is in this case because the attorney had to struggle to serve two different "masters." On the one hand he was commissioned as a deputy attorney general and in that capacity his superior was the attorney general. On the other hand, he was representing a defendant charged with a crime that the attorney general is charged with enforcing. However, prejudice is presumed only when an actual conflict is shown. Cuyler, 446 U.S. at 349-50, 100 S.Ct. at 1719. See also Browning v. State, 607 So.2d 339, 342 (Ala.Cr.App. 1992). Because no actual conflict of interest existed in this case, prejudice is not presumed.
Additionally, the appellant has not demonstrated that he was prejudiced as a result of the fact that his attorney represented the State in the civil case. Nor has the appellant established by any evidence that his attorney's performance was adversely affected by his appointment in that case. The appellant must make a factual showing that his attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." Self v. State, supra. (citations omitted.)
Therefore, the appellant was not denied effective assistance of counsel or a fair trial because of an alleged conflict of interest on the part of his trial counsel.
 VIII.
The appellant argues that he received ineffective assistance of trial counsel because, he says, the trial court refused to grant his motion for a continuance based on grounds that his trial attorneys' caseloads were so heavy that they could not devote sufficient time to the preparation of his trial.
 "Applying the principles of the capital case of Ex parte Hays, 518 So.2d 768 (Ala. 1986), we find it extremely improbable that the additional time for preparation requested by the defendant would have changed the result of the trial and that the defendant has not met his burden of showing actual prejudice in the defense of the charge for which he was convicted. In Hays, our Supreme Court wrote:
 " ' "Hays contends that the trial court's denial of his motion for continuance, under the facts of this case, denied him his constitutional right to effective assistance of counsel under the Sixth Amendment of the United States Constitution. The Court of Criminal Appeals rejected this argument because Hays failed to *Page 1112 
show any actual prejudice in the defense of his case as a result of the trial court's denial of his motion. We agree.
 " ' "The United States Supreme court in Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610, 619 (1983), recognized that:
 " ' "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. See Chambers v. Maroney, 399 U.S. 42, 53-54, 90 S.Ct. 1975, 1982-83, 26 L.Ed.2d 419 (1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of justifiable request for delay' violates the right to assistance of counsel. Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).
 " ' "See also Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Connor v. State, 447 So.2d 860 (Ala.Cr.App. 1984). Furthermore, it is evident from recent Supreme Court precedent that, although certain criteria such as the time provided for the investigation and preparation of the case, counsel's experience, the gravity of the charge and complexity of defenses, and counsel's accessibility to witnesses are relevant factors to consider when evaluating effectiveness of counsel, the controlling analysis is whether the action prejudiced the accused in the defense of his or her case. See United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657
(1984). The accused has the burden of proving prejudice by making a showing that he or she did not receive 'a fair trial, a trial whose result is reliable.' Strickland v. Washington, 466 U.S. 668 [687], 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). As opined in United States v. Cronic, supra:
 " ' " 'The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted — even if defense counsel may have made demonstrable errors — the kind of testing envisioned by the Sixth Amendment has occurred.'
 " ' "466 U.S. at 656, 104 S.Ct. at 2045, 80 L.Ed.2d at 666." Hays, supra, 518 So.2d at 771-72.'
 "Fortenberry v. State, 545 So.2d 129, 130-40
(Ala.Cr.App. 1988), affirmed, 545 So.2d 145
(Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990)."
McWilliams v. State, 640 So.2d 982, 992-93
(Ala.Crim.App. 1991).
In the present case, the appellant failed to demonstrate that he was prejudiced by the trial court's denial of his motion for continuance and that, therefore, his counsel's performance was deficient for failing to secure the continuance. Moreover, a review of the entire record indicates that the appellant received effective representation at all stages of trial. Because the appellant failed to make a showing that he did not receive a fair trial, his argument that his counsel was ineffective must fail.
 IX.
The appellant argues that the State failed to prove a prima facie case of capital murder against him because, he says, he lacked the specific intent to kill. More particularly, he argues that the State failed to prove that he intentionally caused the death of the victim because her death resulted from a heart attack. He also argues that the State presented no evidence as to the time of the victim's death.
However, the record, including the trial court's specific findings of fact, reveals that the State presented sufficient evidence from which the jury could reasonably infer that the appellant intended to kill the victim *Page 1113 
and that the murder was committed during a robbery and a kidnapping in the first degree.
 " ' "To affirm a finding of a 'particularized intent to kill,' the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill." Ex parte Raines, 429 So.2d 1111, 1113 (Ala. 1982). Both prongs of this test are satisfied in this case.' Kennedy v. State, 472 So.2d 1092, 1105 (Ala.Cr.App.), affirmed, 472 So.2d 1106 (Ala. 1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985)."
Nichols v. State, 624 So.2d 1328 (Ala.Cr.App. 1992).
The jury was presented with evidence that clearly established that the appellant had committed the robbery and kidnapping, with full awareness of the victim's heart condition, and that his treatment of the victim directly exacerbated her heart condition, which ultimately resulted in her death. Evidence was also presented that the victim did not die immediately but rather survived for a number of hours in the trunk.
Applying the aforestated authority to the evidence in this case, we conclude the State presented sufficient evidence to support the appellant's conviction.
 X.
In accordance with § 13A-5-53, Code of Alabama 1975, we have reviewed the record for any error that adversely affected the rights of the appellant, and we have found none. Nor do we find any evidence that the sentence was imposed under influence of passion, prejudice, or any other arbitrary reason.
As indicated in its written findings of fact, the trial court properly found the existence of three aggravating circumstances: that the murder was committed during a kidnapping and robbery, as set forth in § 13A-5-49(4), Code ofAlabama 1975; that the appellant had previously been convicted of a felony involving the use or threat of violence to the person, as set forth in § 13A-5-49(2), Code of Alabama 1975; and that the murder was especially heinous, atrocious, and cruel when compared to other capital offenses. Although the appellant presented a number of mitigating circumstances that the trial court considered and specifically addressed, it found that no statutory mitigating circumstances existed in this case. § 13A-5-51, Code of Alabama 1975. The trial court found the existence of the following nonstatutory mitigating circumstances: the defendant expressed remorse for his conduct; the defendant came from a poor family and he had no adequate role model; the defendant had a good work record; the defendant was a good husband to his first wife; the defendant had showed kindness toward others, which indicates a possibility of rehabilitation; his family and friends showed love and caring shown toward the defendant; the defendant appears to function well in penal institutions, indicating that he could serve a long term prison life without difficulty; and the defendant has shown no tendency toward violence against others since his arrest for the abduction of Hazel Liveoak. However, the trial court did not give great weight to these factors.
As to the weighing of the aggravating and mitigating circumstances, the trial court wrote:
 "This Court has considered this case at length. This Court has considered the jury's recommendation, the aggravating circumstances and the mitigating circumstances, and the Court has engaged in the weighing process required by law. After doing so, the Court finds, based on the nature of the aggravating circumstances, and the jury's advisory verdict, that the aggravating circumstances outweigh the mitigating circumstances, and therefore, Donald Dallas's punishment will be fixed at death."
After an independent weighing of the aggravating and mitigating circumstances in this case, we find that the evidence supports the trial court's conclusion and indicates that death was the appropriate sentence. The appellant's statements, his actions, his role in the offense, and the evidence supporting his guilt lead us to this conclusion. *Page 1114 
Therefore, the appellant's conviction and sentence of death are proper and the judgment of the circuit court is affirmed.
AFFIRMED.
All judges concur.