[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13480

Non-Argument Calendar

_____

OCTAVIUS MCLENDON,

Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket Nos. 1:16-cv-20664-FAM,
1:12-cr-20276-FAM-3

_____

Before LAGOA, BRASHER, and MARCUS, Circuit Judges.

PER CURIAM:

Octavius McLendon, a federal prisoner, appeals following the district court's denial of his 28 U.S.C. § 2255 motion to vacate. In 2012, a grand jury charged McLendon and two codefendants -- Henry Bryant and Daniel Mack -- with certain drug offenses ("Count 1-3"), as well as possession of a firearm in furtherance of drug trafficking, in violation of 21 U.S.C. § 846 and 18 U.S.C. §§ 924(c)(1)(A) and 2 ("Count 4"). The jury convicted McLendon and the others on all counts. They appealed, but we affirmed. *United States v. Mack*, 572 F. App'x 910 (11th Cir. 2014) (unpublished).

In 2015, McLendon moved for a new trial as to all counts, under Fed. R. Crim. P. 33 and *Brady v. Maryland*, 373 U.S. 83 (1963). In support, he alleged that, while his appeal was pending, the government had acknowledged that a law enforcement agent who testified at his trial was under investigation for certain instances of misconduct. After the district court denied his new trial motion, he appealed. We affirmed the rejection of his *Brady*-based claims as to his drug convictions, but declined to address a *Brady*-based claim as to his firearm conviction, having concluded that the latter was not adequately presented on appeal. *United States v. Bryant*, 780 F. App'x 738, 747–48 (11th Cir. 2019) (unpublished).

McLendon then filed the present § 2255 motion raising a *Brady*-based challenge to his firearm conviction (Count 4). The

district court denied it as procedurally defaulted, based on our 2019 ruling. In this appeal, McLendon argues that: (1) the district court erred when it failed to address the merits of his claim that a *Brady* violation tainted the jury's consideration of his co-defendant/principal's culpability for illegally possessing a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c), and, therefore, precluded his culpability as an aider-and-abettor to an identical charge; and (2) by denying his requests for an evidentiary hearing and limited discovery, the district court erroneously deprived him of the opportunity to provide support for his *Brady* claim. After thorough review, we affirm.

## I.

When reviewing the denial of a § 2255 motion, we review questions of law *de novo* and findings of fact for clear error. *Thomas v. United States*, 572 F.3d 1300, 1303 (11th Cir. 2009). We review the denial of an evidentiary hearing for abuse of discretion. *Aron v. United States*, 291 F.3d 708, 714 n.5 (11th Cir. 2002). We may affirm on any ground supported by the record, regardless of the ground stated in the district court's order or judgment. *Castillo v. United States*, 816 F.3d 1300, 1303 (11th Cir. 2016).

## II.

First, we are unpersuaded by McLendon's argument that the district court erred when it failed to address the merits of the *Brady* claim he'd raised in his § 2255 motion. Section 2255 allows federal prisoners to obtain post-conviction relief on the basis that a

sentence was imposed in violation of the Constitution or laws of the United States.  28 U.S.C. § 2255(a).

In reviewing rulings on § 2255 motions, we distinguish between claims that are procedurally barred and claims that are procedurally defaulted.  A claim is procedurally barred when a movant raises the same claim in a § 2255 motion that he raised, and we rejected or otherwise disposed of, on direct appeal.  *Stoufflet v. United States*, 757 F.3d 1236, 1239 (11th Cir. 2014); *see also United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000) ("Once a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under [§] 2255") (quotations omitted, alteration adopted).

By contrast, a movant generally procedurally defaults a claim under § 2255 if he failed to raise it on direct appeal, but he may overcome that default with a showing of cause and prejudice or actual innocence.  *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004).  Procedural default is not jurisdictional, but rather an affirmative defense that the government must raise.  *See Howard v. United States*, 374 F.3d 1068, 1071–73 (11th Cir. 2004).  We have not applied procedural default in a context where a claim was unavailable on direct appeal, but available and not raised, on appeal from the denial of a post-trial, post-appeal Rule 33 motion for a new trial.  Importantly, however, we've held that we may skip procedural default issues if the claim would fail on the merits.  *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) (addressing a 28

U.S.C. § 2254 petition), *cert. denied sub nom. Dallas v. Raybon*, 142 S. Ct. 124 (2021).

A *Brady* violation of a defendant's due process rights occurs where the government suppresses material evidence favorable to the defendant, regardless of the government's good or bad faith. *Brady*, 373 U.S. at 87; *Rodriguez v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1277, 1303 (11th Cir. 2014). To establish a *Brady* violation, the defendant must show:

> (1) the government possessed favorable evidence to [him]; (2) [he] does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to [him], there is a reasonable probability that the outcome would have been different.

*United States v. Stein*, 846 F.3d 1135, 1145–46 (11th Cir. 2017) (quotations omitted).

Under 18 U.S.C. § 924(c), any person who either knowingly uses or carries a firearm during and in relation to any drug trafficking crime or who possesses a firearm in furtherance of any such crime shall be sentenced to a term of imprisonment not less than five years. *See* 18 U.S.C. § 924(c)(1)(A)(i). Further, a person who aids or abets the commission of a federal offense is punishable as a principal. *Rosemond v. United States*, 572 U.S. 65, 70 (2014); 18 U.S.C. § 2. A defendant is criminally liable for aiding and

abetting a § 924(c) offense when he actively participates in a criminal scheme knowing that one of his confederates will carry a gun. *Rosemond*, 572 U.S. at 77.

Here, it is unnecessary for us to address whether the district court properly concluded that McLendon's *Brady* claim concerning Count 4 was procedurally defaulted by his failure to raise it on direct appeal following the denial of his motion for a new trial. This is because we conclude that McLendon cannot satisfy his burden under *Brady* for his firearm conviction (Count 4). *See Dallas*, 964 F.3d at 1307. Specifically, he cannot establish that, had the law enforcement agent's misconduct been disclosed, there is a reasonable probability that the outcome of his firearm charge would have been different. *Stein*, 846 F.3d at 1145–46.

These basic facts came out at trial. In the charged conspiracy, McLendon and his co-defendant Bryant had acted as narcotics couriers, and co-defendant Mack, a police officer, had provided protection for the transport while in uniform and with his firearm. Testimony about their scheme came in at trial from several members of law enforcement, and the jury also heard audio recordings and watched video recordings of the conduct in question.

At trial, Dante Jackson, a Federal Bureau of Investigation ("FBI") special agent who had worked the case undercover, testified. He told the jury that while he was posing as the general manager of a South Beach nightclub, he met with one of the defendants on trial, Bryant, to discuss transporting drugs in Miami. Bryant agreed to provide police officers to escort the drug transports. In a

recording of one of their early conversations that was played for the jury, Bryant called co-defendant McLendon (the appellant in this appeal) his "point man" and "brother" and said that the two would split whatever Jackson paid Bryant, while Bryant would pay the officers he hired $3,500 each. Baltimore Police Detective Kay-Tee Tyson also testified, explaining that he was brought into the investigation to play the role of Jackson's drug-trafficking friend.

Later, in another video played for the jury, Detective Tyson was shown marking nine "bricks" of sham cocaine with a marker and handing each one to Agent Jackson to place inside a duffel bag, all in the presence of Bryant and McLendon, who visibly moved closer to see the "bricks" in the bag. On video, Tyson told Bryant and McLendon that there could be "no deviation, no taste, no test," and asked if either of them "get high?" According to Tyson's testimony, they appeared to be insulted and McLendon made a sound as though he was upset with the question. The jury also saw video of Bryant and McLendon returning to Jackson's office on the same day to receive a cash payment for the delivery of the sham cocaine and Bryant and McLendon counted the money in Jackson's office.

Before the second transportation of sham cocaine, Agent Jackson, Detective Tyson, Bryant and co-defendant Mack (who arrived in his police car and wore his police uniform) met all together at a restaurant and a video of the meeting was played for the jury. Detective Tyson testified that at the meeting, he noticed that Mack was carrying a pistol attached to his gun belt. In a video from later that day -- also played for the jury -- Agent Jackson filled a duffel

8                    Opinion of the Court                    21-13480

bag with ten "bricks" of sham cocaine in the nightclub, again in Bryant and McLendon's presence.  Bryant and McLendon subsequently returned to the nightclub to collect a cash payment for the delivery of the sham cocaine, as shown in yet another video played for the jury.  The jury also saw photographs of the sham cocaine from the second transport, the duffel bag used to carry the sham cocaine, and the actual "bricks" of sham cocaine used.

In addition, FBI Special Agent Scott McDonough testified at trial that he had observed, from an airplane, the first transport of sham cocaine.  As part of a Mobile Surveillance Team, McDonough had watched two individuals walk into Jackson's nightclub, emptyhanded, and, shortly thereafter, walk out of it and place a black duffel bag in the rear-seat of a black vehicle.  The aerial surveillance plane then followed the vehicle for about ten miles, and during the course of that trip, Special Agent McDonough saw a marked Miami-Dade patrol cruiser following the vehicle the whole way.  At the second transport of sham cocaine, FBI Special Agent David Rogers was part of the Mobile Surveillance Team.  He testified, similarly to Special Agent McDonough, that he had watched two individuals in a PT Cruiser, traveling on I-95, followed by a marked police car.  He observed the police car approximately 5 to 6 cars behind the PT Cruiser for about 10 miles, and then both vehicles pulled into a parking lot, and the marked police car eventually continued out of sight.  Ihosvany Cuervo, a detective for the City of Miami Internal Affairs Anti-Corruption Unit, had conducted stationary surveillance for both transports.  He told the jury that

during the second transport, he heard radio communication between the marked police car and the PT Cruiser.

Following jury deliberations, McLendon, Bryant and Mack were convicted of conspiracy to distribute cocaine. Also, Mack was convicted as a principal of possession of a firearm in furtherance of a drug trafficking crime, and McLendon and Bryant were convicted as aiders and abettors.

The question currently before us is whether -- based on the government's failure to disclose prior to trial that Special Agent Jackson had engaged in misconduct both before and during the defendants' trial -- there is a reasonable probability that the outcome of McLendon's firearm charge would have been different if the exculpatory evidence had been disclosed. *Stein*, 846 F.3d at 1145–46. We do not believe that there is, because the record reflects that there was ample evidence -- besides Special Agent Jackson's testimony -- to support McLendon's firearm conviction. As we've just detailed (and as a panel of this Court expressly noted in reviewing McLendon's direct appeal), there was testimony from several agents conducting surveillance indicating that a marked patrol car trailed McLendon and Bryant's vehicle for both drug transactions. *Mack*, 572 F. App'x at 913–14. There also was radio communication between the patrol car and McLendon and Bryant's vehicle during the second escort, further showing that McLendon and Bryant were aware of its presence. Plus, Detective Tyson testified that he had seen a firearm in Mack's gunbelt when he was with Bryant earlier in the day of the second transport, and in a recording the

jury heard, Bryant referred to McLendon as his "point man" and "brother" and said they'd share payments, suggesting that McLendon was fully in on the plans. On this record, it was more than reasonable to conclude that McLendon believed that the marked police cruiser following his vehicle closely during a drug transport for eight to ten miles was driven by an armed officer.

As for Jackson's testimony, it is unclear what testimony he offered that would have been material to McLendon's firearm conviction. Jackson told the jury that the only communication he'd had with McLendon was during their in-person meetings on the dates of the two sham drug transfers. Notably, both of these interactions were recorded and played before the jury. We simply do not see how his testimony was relevant to the firearm conviction.

In short, even if Special Agent Jackson's misconduct been disclosed, the other evidence at trial still showed that McLendon knew that Mack would carry a gun during the drug transactions, and we can see no reasonable probability that the result of the proceeding would have been different. Accordingly, we affirm as to this issue.

### III.

We also find no merit in McLendon's claim that the district court abused its discretion by denying his requests for an evidentiary hearing and limited discovery. An evidentiary hearing must be held on a motion to vacate "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled

to no relief." 28 U.S.C. § 2255(b); *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014). "[A] district court need not hold a hearing if the allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record." *Winthrop-Redin*, 767 F.3d at 1216 (quotations omitted).

In McLendon's appeal from the denial of his new trial motion, a prior panel of this Court expressly said -- concerning McLendon's drug convictions -- that "had Agent Jackson's misconduct been disclosed, there is not a reasonable probability that the result of the proceeding would have been different." *Bryant*, 780 F. App'x at 747. In that decision, we affirmed the district court's finding that the verdict against McLendon was amply supported by recordings of his interactions with Jackson and Tyson, and thus held, even absent Jackson's testimony, that he likely would have been convicted of the drug charges. As for the firearm charge at issue in this appeal, even if we assume it is not procedurally defaulted, McLendon's *Brady* argument fails for the reasons we've already detailed above. Thus, because there is no amount of additional evidence of Jackson's misconduct that would have created the reasonable probability of a different outcome for McLendon's drug or firearm convictions, the district court did not abuse its discretion by denying McLendon's *Brady* claim without first allowing limited discovery or an evidentiary hearing on the status of the investigation. *See Winthrop-Redin*, 767 F.3d at 1216.

Accordingly, we also affirm in this respect.

**AFFIRMED.**